SHEARN MOODY, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moody v. Commissioner
Docket Nos. 2566-88, 1659-89
United States Tax Court
T.C. Memo 1995-195; 1995 Tax Ct. Memo LEXIS 195; 69 T.C.M. (CCH) 2517; T.C.M. (RIA) 95195; May 2, 1995, Filed *195 Decisions will be entered under Rule 155. For petitioner: William R. Cousins, III, Joel N. Crouch, and Charles M. Meadows, Jr.
For respondent: Melanie R. Urban and David E. Whitcomb. WRIGHT
WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION WRIGHT, Judge: By timely notices of deficiency, respondent determined deficiencies in excise taxes pursuant to section 4941(a) and (b) and section 4945(a) and (b), plus additions to tax under section 6684, [1] as follows: Docket No. 2566-88:
Year Excise Tax Deficiency
Dec. 31, 1983
$ 38,600
Dec. 31, 1984
38,600
Dec. 31, 1985
38,600
Dec. 31, 1986
38,600
Dec. 31, 1987
1,642,612
Docket No. 1659-89:
First Tier Excise
Second Tier Excise
Addition
Year
Tax Deficiency Tax Deficiency
to Tax
Dec. 31, 1984
$ 74,580
$ 29,580
Dec. 31, 1985
198,480
$ 30,000
141,230
Dec. 31, 1986
195,349
10,000
143,724
Dec. 31, 1987
175,349
133,724
Dec. 31, 1988
166,114
5,063,913
*196 Period Ended
Addition to Tax
Oct. 27, 1988
$ 6,579,424
The issues for decisions are: (1) Whether petitioner is liable for excise taxes under section 4941(a)(1) for acts of self-dealing concerning the use of facilities at the Hotel Washington during the years 1983 through 1986. We hold that he is not. (2) Whether petitioner is liable for excise taxes under section 4941(a)(1) and (b)(1) for acts of self-dealing with respect to specific grants made by the Moody Foundation between the years 1983 and 1986. We hold that he is, to the extent set forth herein. (3) Whether, for the taxable years 1984 through 1988, petitioner is liable as a foundation manager for excise taxes under section 4941(a)(2) with respect to the alleged acts of self-dealing. We hold that he is, to the extent set forth herein. (4) Whether, for the taxable years 1984 through 1988, petitioner is liable for additions to tax under section 6684 because the alleged acts of self-dealing with respect to the Moody Foundation were willful and flagrant. We hold that he is, to the extent set forth herein. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner resided in Houston, *197 Texas, when he filed his petitions herein. The Moody Foundation
In 1942, W.L. Moody and Libbie Shearn Moody established the Moody Foundation. W.L. Moody's bequest to the Moody Foundation exceeded $ 400 million. The Moody Foundation was endowed with substantial stockholdings in American National Insurance Co. (ANICO), a large insurance company founded by petitioner's great-grandfather. W.L. Moody died in 1954 and bequeathed his interest in the stock of a corporation named Gal-Tex to the Moody Foundation. The Moody Foundation is a private charity organized for the benefit of the people of Texas. It makes grants in a wide variety of fields, including education, religion, health, and the humanities. In legal form, it is a trust. During the years at issue, the Moody Foundation was headed by three trustees: petitioner, his brother Robert Moody, and their aunt Mary Moody Northen. Ms. Northen died on August 26, 1986; her position as trustee was filled by petitioner's mother, Frances Moody Newman. Under the trust indenture, the Moody Foundation trustees held quarterly meetings where they decided which grant applications would be considered, approved, and funded. At least *198 two trustees of the three had to vote for a grant before it was approved. A single trustee could not approve a grant. Throughout their respective tenures, the three trustees promoted grants in their own particular areas of interest. The Moody Foundation had general grant guidelines to be followed in determining whether a grant would be funded. It had a staff which administered the grants program. The staff prepared information regarding grant applications for the trustees. Occasionally, a grant was made subject to an "expenditure responsibility" agreement. By executing an expenditure responsibility agreement, the recipient of a grant undertook to abide by strict spending and reporting requirements. The Moody Foundation was advised by a number of law firms. In October 1982, petitioner visited Washington, D.C., to engage, on behalf of the Moody Foundation, the law firm of Caplin & Drysdale. That firm was to provide legal advice regarding grants in which petitioner had an interest. That firm agreed to assist the Moody Foundation by rendering opinions as to whether a particular grant, or payment of a grant, could be made. The firm, however, did not undertake general responsibility *199 for making pre-grant inquiries or other investigations. Those duties remained the responsibility of the Moody Foundation and its staff. Petitioner's Assets
Libbie Shearn Moody died in 1943 and bequeathed her interest in the stock of Gal-Tex to the Libbie Shearn Moody Trust. She established that trust for the benefit of family members, including petitioner Shearn Moody, Jr. That trust is also referred to as Trust 57. The trustee of Trust 57 is the Moody National Bank. When Libbie Shearn Moody died, petitioner inherited a one-eighth life interest in the income of Trust 57. In 1962, petitioner contributed two-fifths of his income interest in Trust 57 to the Empire State Life Insurance Co. (Empire Life). Petitioner had incorporated Empire Life. Petitioner placed the other three-fifths of his interest in Trust 57 into the Shearn Moody Holding Co., of which he was the sole shareholder. This latter interest would have generated approximately $ 750,000 for each of the years in issue. During the years at issue, petitioner also had income from Trust 19, which held ANICO stock. Petitioner additionally had an interest in the Shearn Moody Estate Agency, Trust Account 42, and *200 he was entitled to director's fees and to royalties from certain oil drilling operations on Galveston Island. In 1972, the Alabama Insurance Commission lowered the value assigned to the interest in Trust 57 that had provided a substantial part of the capitalization of Empire Life. Shortly thereafter, the Alabama Insurance Commission placed Empire Life into receivership. The receiver instituted proceedings against petitioner. One result was a judgment against petitioner of $ 6 million, which the receiver undertook to collect. The judgment became final in 1982. Petitioner believed that organized crime was behind his loss of control of Empire Life. Petitioner declared bankruptcy in 1983, but for some time thereafter he remained as debtor in possession, and he retained distribution of trust income of $ 160,000 until July 1985. In the bankruptcy proceedings, the receiver continued his efforts to take petitioner's assets in satisfaction of the judgment; petitioner vigorously resisted the receiver's efforts, and the resulting litigation consumed several more years. During the years in issue, petitioner's mother lent him additional amounts to cover costs associated with some of the *201 legal proceedings against him. The Hotel Washington
The Hotel Washington is located in Washington, D.C. Its owner, during the years in issue, was the corporation named Gal-Tex, which, in turn, was owned equally by the Moody Foundation and by the Libbie Shearn Moody Trust. During the years in issue, there were seven members of the board of directors of Gal-Tex: Mary Moody Northen, petitioner, Robert Moody, his son Russell Moody, Eugene Lucas, L.L. Purjet, and Thomas Mayfield. Ms. Northen served as board chairman, Eugene Lucas was president, and petitioner and his brother Robert were each vice presidents of Gal-Tex. Petitioner, his brother Robert, and their aunt Mary Moody Northen were also trustees of the Moody Foundation during those years. Although petitioner received complementary use of a room in the Hotel Washington, he and his guests also incurred substantial other charges at the hotel which he billed to the Foundation. During the years at issue, petitioner incurred an alleged $ 35,679.62 in charges at the Hotel Washington, excluding charges for complimentary room occupancy. Petitioner's friends and associates incurred another amount, asserted to be $ 25,934.09, *202 in room charges and other hotel services. His friends and associates charged additional hotel expenses to petitioner's account in the alleged amount of $ 54,364.97. Gal-Tex alerted Moody Foundation attorneys and sought to collect the 1983 charges through petitioner's bankruptcy proceeding. This attempt was unsuccessful. In 1986 the hotel again submitted the unpaid bills incurred by petitioner and his associates to the Moody Foundation. Caplin & Drysdale informed petitioner that, in order to justify the Moody Foundation's payment of these expenses, he should provide substantiation of the Foundation-related purposes that required incurring the hotel charges. Shortly after receiving that advice, petitioner ceased staying at the hotel. Again, the Foundation refused to pay the charges, because the charges had not been substantiated as relating to Foundation business. The hotel ultimately wrote off the charges. While at the hotel, petitioner conducted personal business as well as business on behalf of the Moody Foundation and Gal-Tex. The Caddy Grants
Freedom International Foundation
Petitioner met an individual name Douglas Caddy in 1981. Mr. Caddy was active in *203 conservative causes and had written and published a book about politics. Mr. Caddy was president of a dormant organization named Freedom International Foundation (FIF). FIF was recognized by the Internal Revenue Service (IRS) as a tax-exempt organization pursuant to section 501(c)(3). Petitioner urged Mr. Caddy to apply to the Moody Foundation for grants to carry on his work. On March 23, 1982, FIF applied to the Moody Foundation for a grant in the amount of $ 750,000; this amount was later reduced to $ 300,000. The staff of the Moody Foundation reviewed the application. The Moody Foundation trustees considered and approved this grant, number 82-130, on April 5, 1982. The Foundation paid FIF $ 300,000 from June 1, 1982, through March 3, 1983, in three installments. During this time, Mr. Caddy began a close business association with petitioner. Attorneys for the Moody Foundation questioned certain expenditures made by FIF. They accordingly met with Mr. Caddy in September 1982. After that meeting, FIF executed an expenditure responsibility agreement setting forth specific restrictions. Moody Foundation continued funding the grant. Based upon representations made to it, the *204 newly hired law firm of Caplin & Drysdale approved making the final installment payment of $ 98,500, indicating that it would be "prudent" for the Moody Foundation to require adherence to the expenditure responsibility in the grant. FIF sponsored a 2-day conference on "the Emerging Role of Hispanics" beginning in San Antonio on March 11, 1983, in compliance with the grant contract of the Moody Foundation. The speakers included noted public leaders, including the Mayor of San Antonio and a prominent Texas Congressman. One of the projects which FIF proposed to undertake, with the assistance of Moody Foundation funds, was a layman's version of the Texas Election Code. An individual named Preston Goodwin completed this project; he received $ 2,500 for his efforts. Investigative Research Foundation
The Investigative Research Foundation (IRF) was another organization that was tax exempt under section 501(c)(3). Douglas Caddy incorporated, controlled, and represented IRF. He served as director and its legal counsel. Its purpose was to investigate and inform the public about organized crime and terrorist issues. IRF applied to the Moody Foundation for a grant of $ 750,000 in *205 March 1982. The Moody Foundation staff reviewed the application, and it was rejected by the Moody Foundation trustees at their meeting on April 5, 1982. In June, IRF made another application, which again was reviewed by the staff of the Moody Foundation. The trustees approved this grant, number 82-202, for $ 375,000. Its purposes included assisting "a comprehensive research and analysis program on the causes of crime and international terrorism". Mr. Caddy had placed a young man named Mr. Tanner in the position of president of IRF. Mr. Tanner's work involved computer processing and finances, reading about the subject matter of the grants, preparing television interviews, and reviewing qualifications for the organization's tax exemption. As an officer of a grantee of the Moody Foundation, Mr. Tanner communicated with Peter Moore, director of the Moody Foundation staff, and with the Caplin & Drysdale law firm. Mr. Moore visited the IRF offices (which it shared with others of Caddy's entities) to verify that IRF was working as it had represented in the grant applications. IRF provided the Foundation with audited financial statements prepared by a major accounting firm. Between *206 November 1982 and August 1983, the Moody Foundation paid the IRF grant in three installments of $ 125,000 apiece. IRF retained an individual named Juval Aviv and his company, Interfor, as consultants on organized crime. IRF paid Interfor $ 18,000 during 1982 and $ 36,000 in 1983 for research projects. Mr. Aviv and Interfor produced seven or eight reports for IRF. Mr. Aviv met petitioner during the course of his contract, and he agreed to do some work for petitioner. He did so on an intermittent basis and was paid for some of these efforts by one of petitioner's attorneys. Mr. Aviv did not receive compensation for his work for petitioner from the IRF grant money. In October 1983, IRF sponsored a 2-day conference on terrorism. The conference took place in Houston, Texas, in satisfaction of the agreement under grant number 82-202. At petitioner's behest, IRF paid $ 16,000 to Marta Karpan, a friend of petitioner's, to manage publicity and provide press assistance. She only provided a list of media outlets. At petitioner's behest, IRF also paid $ 4,000 to Wilmot McCutcheon, an attorney in Houston, Texas, although Mr. McCutcheon was not assigned to do any work for IRF. Also *207 in October 1983, IRF applied to the Moody Foundation for another grant, number 83-216, in the amount of $ 350,000. The money was to provide IRF's operating expenses for its second year and to undertake a research project on "organized crime in the Southwest and in Texas." Following a review by the Moody Foundation staff, the trustees approved a grant in the amount of $ 175,000. Based upon the information provided, Caplin & Drysdale advised that the grant and its payments could be made. The Foundation paid this amount in two installments during the first half of 1984. IRF sponsored a 3-day conference presented by International Intelligence Network in Houston, Texas, in November 1984. In June 1984, IRF applied for a grant, number 84-89, in the amount of $ 250,000, seeking support for its third-year expenses and for research projects dealing with organized crime. Caplin & Drysdale, based upon the information submitted, advised that the Moody Foundation could properly approve that grant request. Moody Foundation staff reviewed the application, and in July 1984 the trustees approved it in the full amount. The Foundation paid out that money in installments beginning in October 1984 *208 through September 1985. IRF spent $ 10,000 to pursue the writing and publication of a book whose source was an individual named Billie Sol Estes. The proposed book would describe an alleged conspiracy involving highly placed national political figures. Mr. Caddy managed to interest officials of the Justice Department in the information that Mr. Estes might reveal. Mr. Estes ultimately refused to cooperate, however, and the project was dropped. Petitioner later revealed to Mr. Caddy that part of petitioner's interest in talking to Billie Sol Estes was to establish a working relationship between petitioner and officials of the Justice Department. IRF produced three studies in compliance with the terms of its grant number 84-89. IRF paid $ 24,000 for one of the studies dealing with drug trafficking written by Pamela Tedford. Ms. Tedford was the daughter of Billie Sol Estes. Texas Institute of Government
The Texas Institute of Government (TIG) is another tax-exempt organization pursuant to section 501(c)(3). At petitioner's suggestion, Douglas Caddy prepared an application for a $ 600,000 grant to TIG from the Moody Foundation. The money would be used for "initiation of *209 a comprehensive program aimed at improving the operation of state and local government". The application was submitted on March 25, 1983. Mr. Caddy accompanied Shadrick Jeffries, who controlled TIG, to an interview with the officials of the Moody Foundation. Caplin & Drysdale advised that the proposed grant was within the range of activities that were eligible for funding by the Moody Foundation, advising that the grant should be made under expenditure responsibility procedures. Following a staff review, the Moody Foundation decided to issue a grant of $ 100,000 and forwarded that amount to TIG on May 17, 1983. TIG paid some $ 48,000 of that amount to Creative Capital, Inc., an entity owned by Douglas Caddy. Creative Capital produced a report for TIG in return for that payment. The principal author of that work, however, received only $ 2,500 for his efforts. Citizens Economic Foundation
The Citizens Economic Foundation (CEF) was recognized under section 501(c)(3) as a tax-exempt organization. Douglas Caddy organized and controlled CEF and served as its legal counsel. CEF applied to the Moody Foundation for a grant, number 83-222, on October 5, 1983. It sought $ 350,000 *210 to sponsor research concerning economic trends in Texas and the United States, and to sponsor a conference regarding those trends. Following a review by Moody Foundation personnel, the trustees approved the grant application, in the amount of $ 125,000, at a quarterly meeting held on December 15, 1983. Based upon information submitted, Caplin & Drysdale approved payment of the grant under an expenditure responsibility agreement, and payment was made between January and October 1984. Under the terms of the grant, CEF produced three studies on U.S. economic policy. It also sponsored a 2-day conference on "Unfinished Business: Problems in Policy for a Conservative Majority" in Dallas, Texas, in October 1985. The conference featured noted speakers from Congress, from the newspaper industry, and from organized labor. On July 10, 1985, CEF applied to the Moody Foundation for another grant in the amount of $ 175,000. Moody Foundation staff reviewed the applications, and the trustees rejected it at their quarterly meeting of November 4, 1985. Texas A&M University Development Foundation
The Texas A&M University Development Foundation (Texas A&M Foundation) is an exempt organization *211 within the meaning of section 501(c)(3). Its purpose is to administer gifts and grants for the benefit of Texas A&M University. Some of those grants fund publication of the Texas A&M University Press (University Press). An advisory board to the University Press monitors and approves manuscripts before publication. If the advisory board does not approve a manuscript, the University Press will not publish it. When grant moneys were made available to underwrite the publication of a specific book, officials of the University Press and the Texas A&M Foundation often asked that the grant be supplemented with endowment funds. These supplemental funds were used to underwrite other publications, such as books by members of the faculty. Jack Love was a former Texas legislator, an insurance executive, and an acquaintance of petitioner's. He sought to write a book about the Texas insurance industry. At his behest, in 1980 the Texas A&M Foundation had submitted an application for $ 750,000 to the Moody Foundation. Following staff review, the Foundation awarded the grant, number 80-234, to Mr. Love, who was named manager of the project. On July 14, 1982, the Texas A&M Foundation again *212 applied to the Moody Foundation for a grant, number 82-201, for $ 500,000. Mr. Love was slated to be the project manager. The project was to be a legislative newsletter. The trustees approved this grant at their meeting on the next day. Some $ 200,000 of the grant was earmarked as an endowment for the University Press, and $ 300,000 was to be paid to the author. Moody Foundation personnel evaluated the proposal, and Caplin & Drysdale, on the information submitted, agreed that the grant was "within the scope of activities permissible for private foundation support". Jack Love became seriously ill. Petitioner accordingly asked Mr. Caddy to visit Mr. Love and to look into the book project. Mr. Caddy did so, and Mr. Love introduced Mr. Caddy to the chief of the Texas A&M Foundation. Mr. Love died of cancer in August 1982. The Texas A&M Foundation substituted Mr. Caddy as author of the book on insurance to be funded by grant number 80-234. Mr. Caddy wrote a book entitled Understanding Texas Insurance, which fulfilled the requirement of grant number 80-234. Texas A&M Foundation paid Douglas Caddy $ 100,000 for his efforts. Mr. Caddy played a similar role with respect to Mr. *213 Love's other project. When Mr. Love died, Mr. Caddy succeeded him with respect to grant number 82-201, again with the concurrence of the Texas A&M Foundation. The Moody Foundation made payments on this grant in the latter portion of 1983. The newsletter idea was dropped, and Mr. Caddy instead produced a book, Legislative Trends in Insurance Regulations, which fulfilled the requirements of grant number 82-201. Texas A&M Foundation paid $ 233,500 to Douglas Caddy for his efforts in grant number 82-201. Early in 1984, the Texas A&M Foundation applied for another $ 500,000 grant, number 84-26, from the Moody Foundation. The proceeds were to be split, with $ 200,000 going to the project manager and $ 200,000 to the University Press. The grant was to be used to produce a book about the technological revolution. Mr. Caddy was to be the project manager. Following a staff review, the trustees approved $ 300,000 of the amount requested, with $ 250,000 going to the author and $ 50,000 to the University Press. The Moody Foundation paid out this grant in installments from May 1984 through June 1985. As a result, Mr. Caddy wrote a book entitled "Exploring America's Future". On January *214 14, 1985, Robert Rutledge, on behalf of Texas A&M Foundation, applied to the Moody Foundation for a grant, number 85-8, in the amount of $ 400,000; this application was denied funding at the trustees' meeting on November 4, 1985. The Alabama Sting
Petitioner was convinced that corrupt influences had engineered his loss of control of Empire Life. He took his complaints to the U.S. Department of Justice, which became interested in his assertions. With the approval of the Justice Department's Public Integrity Section, agents in the Federal Bureau of Investigation (FBI) became involved in the investigation. An undercover "sting" operation was discussed and decided upon. One of petitioner's advisers induced Mr. Caddy to participate in this operation. The Justice Department agreed not to prosecute petitioner or Mr. Caddy for their roles in this operation. Little came of this operation, however, because news of its existence became public. As part of the undercover operation, the Government agents asked petitioner, through Mr. Caddy, to make payments to one of the potential witnesses in the case. Mr. Caddy undertook to do so, using $ 5,000 from the Texas A&M Foundation grants. *215 In preparation for the sting operation, Mr. Caddy had shifted to other parties a "subfund" of $ 83,500 from the Texas A&M Foundation funds paid to him in grant number 82-201; those sums were later returned. Fearful of the consequences of being a participant in a sting operation, Mr. Caddy also took out large insurance policies on his life, in favor of his staff. The premiums came from the Texas A&M Foundation grant. After the sting operation collapsed, Douglas Caddy forwarded some $ 100,000 of the amount he had received to the Texas A&M Foundation as "contributions", but, after some questions were raised, this amount was returned to the Moody Foundation. University of Houston Law Foundation Grant
The University of Houston Law Foundation (Law Foundation) is an association which raises funds to support the University of Houston Law Center. The Law Foundation is a tax-exempt section 501(c)(3) organization. It sought a $ 500,000 grant, number 83-166, from the Moody Foundation in July 1983. The grant was to sponsor a symposium on white collar and organized crime. Caplin & Drysdale advised that the grant was within the range of projects that could permissibly be funded by *216 the Moody Foundation. The Moody Foundation staff reviewed the project, and the trustees approved the grant in the amount of $ 400,000. Mr. Caddy advised the Law Foundation that the Moody Foundation recommended David Brockway to be project manager. Interested in keeping Mr. Brockway in charge, petitioner asked Caplin & Drysdale to verify that Brockway's participation was legal and that the Moody Foundation was being dealt with fairly by the Law Foundation. The Moody Foundation funded this program with payments in 1983 and 1984. Mr. Brockway was successful in being awarded the project manager's job. He conducted several planning sessions in California and Texas. He also contacted people with knowledge of organized crime, including people in Federal agencies. Mr. Brockway was to receive $ 10,000 for his work, and he had an additional $ 90,000 to spend in arranging the symposium. Mr. Brockway paid some of these funds to an individual in Los Angeles, California, who used the name "Newman" and who claimed to have underworld ties. Petitioner and Douglas Caddy met with this figure, who indicated an interest in petitioner's legal problems. This individual took a substantial amount *217 of the grant money, but then he did not participate in the symposium. There was a dispute as to whether amounts paid by Mr. Brockway to this individual may have related to separate real estate dealings. During this period, Mr. Brockway was also instrumental in arranging a meeting for petitioner with Government officials in Washington, D.C. Officials of the Law Foundation developed reservations about the scope and direction of Mr. Brockway's work. They replaced Mr. Brockway as project manager with another individual named Mark Cordray, who was paid $ 37,500 for his work in putting on the program. The result of the grant was that the Law Foundation sponsored a 3-day conference on organized crime in Houston, Texas, beginning October 18, 1984. A portion of the program was presented on national television. Many of the speakers at the symposium appeared directly or indirectly through Mr. Brockway's efforts. In the fall of 1984, Mr. Caddy's role in petitioner's and the Moody Foundation's affairs decreased rapidly. Petitioner had met another individual named William Pabst. The Pabst Grants
William Pabst had founded an organization known as the Centre for the Independence *218 of Judges and Lawyers/United States (CIJL) in October 1978. It maintained offices in Houston, Texas. Mr. Pabst also conducted programs on setting up and running foundations. His services included filling out forms and obtaining grants. He was assisted by an individual named Vance Beaudreau. They charged between $ 30,000 and $ 40,000 for each such program. In addition to Vance Beaudreau, an individual named Diane Simons was associated with CIJL during the years at issue. Among the foundations Mr. Pabst and Mr. Beaudreau helped establish were the Carlson Foundation, the Earl Foundation, and the Hamilton Law Institute. Petitioner did not know the principals of these foundations, nor did he assist in their creation. Petitioner did not have the authority to direct expenditures of CIJL. In July 1983, Mr. Pabst was indicted in connection with charges of theft from the ARCO Foundation; he was convicted of this offense in May 1985 and sentenced to a term of 10 years. Mr. Pabst and Mr. Beaudreau introduced themselves to petitioner late in 1984, citing their mutual acquaintance with an attorney named Jane Ford, who had represented both petitioner and Mr. Beaudreau. Beginning in January *219 1985, Douglas Caddy attempted to steer petitioner away from William Pabst by informing petitioner that Mr. Pabst had a dubious past. Petitioner, however, was greatly impressed with Mr. Pabst. As described by a senior member of the Moody Foundation staff, "Mr. Pabst was a con man, and he had done a number on -- he had Shearn convinced that he was the next thing to God." At a meeting with petitioner, Mr. Pabst informed petitioner that CIJL needed Moody Foundation moneys to continue to operate. Petitioner replied that he was uncertain that he could provide the moneys sought. After petitioner left the meeting, Mr. Pabst explained to one of his employees Mr. Pabst's plan that Moody Foundation funds would be provided to subsidiary foundations of CIJL. CIJL would then take the lion's share of such funds. The Carlson Foundation
Merle Carlson is a physical therapist in El Campo, Texas. He met Vance Beaudreau in 1980, and Mr. Beaudreau introduced him to William Pabst. Mr. Beaudreau talked Mr. Carlson into forming the M.T. Carlson Foundation on August 6, 1982; it applied for and received recognition as a tax-exempt organization pursuant to section 501(c)(3). Mr. Beaudreau recommended *220 that the M.T. Carlson Foundation obtain funding from the Moody Foundation. The money would be spent to create a book, to be produced by CIJL, about the abuse of juries. Mr. Beaudreau and Mr. Pabst promised that Mr. Carlson would receive records of how the money was spent and how the book was progressing. They told Mr. Carlson that he would have final approval of anything published. They did not, however, live up to these commitments. On November 1, 1984, the M.T. Carlson Foundation applied to the Moody Foundation for a grant, number 84-136, in the amount of $ 375,000. The Carlson grant application was expeditiously reviewed by Moody Foundation personnel. The trustees approved it prior to the next scheduled trustees' meeting. The award was confirmed at the subsequent meeting, on December 10, 1984, and the funds were disbursed within approximately a 6-week period in November and December 1984. At Mr. Pabst's suggestion, approximately 90 percent of the funds awarded to the Carlson Foundation went to CIJL, to associated entities, or to satisfy obligations of CIJL. A book entitled Jury Manual, which had already existed in draft form, was produced, and some 5,000 copies were sent *221 to libraries around the State, including those in colleges and high schools. Earl Foundation
Messrs. Pabst and Beaudreau also sold a foundation package to Dr. Robert Earl, a pediatric dentist in Houston, Texas. The Earl Foundation was incorporated on February 20, 1981, and received recognition as a tax-exempt organization pursuant to section 501(c)(3). At Mr. Beaudreau's suggestion, the Earl Foundation applied to the Moody Foundation for a grant, number 84-155, of $ 150,000. The purpose of the grant was to study dental archaeology. Moody Foundation personnel reviewed the grant, and it was approved by the trustees at the meeting on December 10, 1984. The Moody Foundation paid out the $ 150,000 grant in a lump sum on January 16, 1985. The Earl Foundation paid almost all of this amount, some $ 142,122, to CIJL or to associated entities and individuals. On February 15, 1985, the Earl Foundation applied for another grant, number 85-28, in the amount of $ 450,000. The grant was to be used for three more dental research projects. Moody Foundation personnel reviewed the application, and it was quickly approved by the trustees in a meeting on February 25, 1985. The money was *222 paid out over the next 3 months. Caplin & Drysdale recommended that the grant, if approved, should be made under expenditure responsibility, and further, that additional information should be obtained. By the time of that recommendation, however, the grant had been approved. Of the funds received by the Earl Foundation for the $ 450,000 grant, some $ 418,666.06, or more than 90 percent, went to Mr. Pabst and Mr. Beaudreau or to their associates. Of this amount, $ 187,846.37 went directly to L.T. "Butch" Bradt, an attorney for CIJL, or to his entities or employees. By the end of the relationship, Dr. Earl did not trust either Mr. Pabst or Mr. Beaudreau and thought they were "con men". Dr. Earl did not meet petitioner until March 29, 1985. He had no agreement to split money with petitioner, nor did he give money to petitioner. For his part, petitioner, although he had been told that CIJL needed money, did not know of CIJL's siphoning of money from the Earl Foundation. Hamilton Law Institute
Bruce and Irene Hanson incorporated the Hamilton Law Institute (HLI) on July 7, 1978; it subsequently received recognition as a tax-exempt organization pursuant to section 501(c)(3). *223 Bruce Hanson was introduced to William Pabst by Howell Willis. Mr. Pabst claimed that through CIJL he represented the Moody Foundation and had the blessings of its three trustees. Mr. Pabst said that he could arrange for a grant from the Moody Foundation to help with Mr. Hanson's study of a jury education project. Mr. Willis agreed to take over the HLI as executive director in 1985. On June 21, 1985, HLI applied to the Moody Foundation for a grant, number 85-78, in the amount of $ 500,000 for a jury education project. Mr. Pabst and CIJL handled the paperwork of the grant. Mr. Willis worked primarily with Diane Simons. All the legal work was to be handled by Butch Bradt, the attorney for CIJL. Petitioner asked Caplin & Drysdale to do more than usual with respect to the HLI grant. He asked that the law firm expedite its review in order to eliminate any problems in funding. Mr. Willis received inquiries from both Caplin & Drysdale and the Moody Foundation staff for information regarding the grant application. Mr. Willis would then ask Mr. Pabst for that information, and Mr. Pabst would say that he was gathering it. When the attorneys at Caplin & Drysdale became frustrated *224 in attempting to obtain information from HLI, petitioner volunteered to assist in obtaining the material. In response to the requests for information, the staff of CIJL provided false documentation. Petitioner did not know the documents were false. Moody Foundation personnel reviewed the application. Petitioner exerted pressure to have the grant approved and authorized. The Moody Foundation conditionally approved the HLI grant at a meeting on July 15, 1985, pending further information. Petitioner was thereafter willing to declare to the Moody Foundation that he was "aware and knowledgeable" of the HLI, and that he had met with the individuals responsible for its operation. Petitioner, however, had never met Mr. Willis. Caplin & Drysdale had learned of Mr. Pabst's criminal conviction and asked whether Mr. Pabst was connected with HLI. Petitioner assured Caplin & Drysdale that, while Mr. Pabst had recommended HLI as a grantee, there was no connection between Mr. Pabst and HLI. The Moody foundation paid $ 400,000 of the $ 500,000 grant amount to HLI in three installments between August and October 1985. Although payment of the final installment was requested in 1986, it was *225 not paid. HLI disbursed the funds it received in accordance with instructions from Mr. Pabst or Ms. Simons. Shortly after they were issued, 77 percent of the funds, $ 382,960.30, went to Mr. Pabst or his associates. Of this amount, $ 110,116 was paid to Butch Bradt, or to his entities or associates. Initially, as far as Mr. Willis was concerned, everything was legitimate. At some point, however, he discovered that the telephone at CIJL was disconnected and that Mr. Pabst had disappeared. Mr. Willis suspected that something was wrong. He later came to the conclusion that Mr. Pabst was a crook. Mr. Willis did not share any of the Moody Foundation moneys with petitioner, nor did petitioner instruct Mr. Willis to send moneys to any third party, nor was there any agreement that he do so. Mr. Willis did not meet petitioner during any of the periods at issue. Expenditures From the Pabst Grants
Mr. Pabst utilized the funds gleaned from the Carlson, Earl and HLI Foundations for his own purposes, including renting an elaborate office, writing a book, and investigating a judge in Nevada who apparently was not connected with petitioner's case. Mr. Pabst, however, also steered *226 some of the Foundation funds to petitioner's use. The first payment from Moody Foundation funds went to the Carlson Foundation on November 6, 1984; it was disseminated to various Pabst-related entities on November 7, 1984. Later that month, an employee of CIJL went to North Carolina three times for research on behalf of CIJL. From the results of this research Mr. Pabst prepared a pamphlet detailing alleged improprieties on the part of the bankruptcy judge who had jurisdiction over petitioner's bankruptcy case. This pamphlet apparently was surreptitiously disseminated at a conference of bankruptcy judges. The same employee traveled to Alabama to investigate and possibly disqualify one of the judges who had ruled upon the Empire Life matter. He spent a total of $ 8,000 on the trips to North Carolina and Alabama. Mr. Pabst also directed this employee to deliver $ 2,000 in cash to petitioner. On November 27, 1984, petitioner met in Washington, D.C., with William Pabst, his wife Rosario Montes, petitioner's assistant Norman Revie, the attorney named Butch Bradt who worked for CIJL, and petitioner's associate James Brewer. Also present were Jane Ford and Briscoe Swan, petitioner's *227 bankruptcy attorneys. The participants discussed petitioner's finances and his bankruptcy case. They reached an understanding to the effect that petitioner's legal fees relating to matters that were strictly bankruptcy would be billed as a claim against the bankruptcy estate. Other matters would be billed separately, through CIJL. At the meeting, it was proposed that Mr. Bradt look into the bankruptcy matter, although he would be employed by CIJL. Mr. Bradt had a long association with Mr. Pabst. Mr. Bradt had performed legal services for CIJL before he met petitioner. Mr. Bradt also represented Vance Beaudreau and William Pabst in criminal proceedings. He received a retainer of $ 10,000 to review the alleged improprieties on the part of the North Carolina bankruptcy judge who was handling petitioner's case. As an attorney, Mr. Bradt billed CIJL for approximately $ 95,385, for work done on petitioner's legal matters. Mr. Bradt's billing rate was $ 200 to $ 300 per hour. The bills were paid by CIJL from Moody Foundation funds that had been awarded to the Earl Foundation or to HLI. Jane Ford had been retained, in June 1983, with another lawyer named Briscoe Swan, to represent *228 petitioner in his bankruptcy proceedings. Petitioner initially paid Ms. Ford $ 10,000 ($ 5,000 of which she gave to Mr. Swan), and she subsequently received $ 160,000 from Trust 19, petitioner's trust account. Following the November 27, 1984, meeting, Ms. Ford complained to petitioner that she was being forced to work almost full time on petitioner's bankruptcy case, but that she was receiving no income. Petitioner assured her that he had a way, through Mr. Pabst, that she would be able to do a research project and get paid through Mr. Pabst or some of his organizations. This procedure would give her enough income to keep her from having to take other clients. Following this conversation, CIJL engaged Ms. Ford to undertake a research project on State insurance commissioners and how they work in the United States. CIJL paid Ms. Ford some $ 37,500 for that project, but she returned $ 1,500 of this amount to Vance Beaudreau. She also received $ 50,283.08 from the amounts paid to Butch Bradt by the Earl Foundation. HLI paid her another $ 50,000 directly. Pursuant to instructions from Mr. Pabst's associate Diane Simons, however, Ms. Ford returned $ 43,465 of amounts she had received *229 to the Earl Foundation. Jane Ford ceased representing petitioner in July 1985. In that month, the bankruptcy trustee cut off the income flow to petitioner from Trusts 19 and 57. In November 1985, Ms. Ford filed an application for attorney's fees with the bankruptcy court. She did not disclose therein the amounts she received from CIJL, the Earl Foundation, the Hamilton Law Institute, or Butch Bradt because, she explained, they did not relate to Shearn Moody's bankruptcy. In May 1985, both Harold MacDonald, at the Moody Foundation, and Frank Chapper, of Caplin & Drysdale, informed petitioner about the conviction of Mr. Pabst, and Mr. Moody defended Mr. Pabst as having been "railroaded". At the end of November 1985, following some accusations by Mr. Caddy, the Moody Foundation attorneys, including Caplin & Drysdale, established an independent investigation of Mr. Pabst's activities with respect to the Moody Foundation. By 1986, Moody Foundation moneys stopped coming into CIJL, and William Pabst had fled the United States. Bauman Grants
Mr. Robert Bauman is a former U.S. Congressman who was active in conservative causes. In 1985, Marta Karpan, an associate of William *230 Pabst, approached Mr. Bauman about representing both William Pabst and petitioner. Mr. Bauman was eager for work and contacted some people in Congress on behalf of Mr. Pabst. He met petitioner in August 1985, but did not undertake legal representation of petitioner. Mr. Bauman did, however, become a close associate of petitioner's within a short time of their first meeting. In September 1985, at petitioner's request, Mr. Bauman accompanied petitioner on a trip to Mountain Lake, Virginia, to secure Mr. Bauman's advice as to the competency of Mary Moody Northen. Ms. Northen was petitioner's aunt, and a fellow trustee of the Moody Foundation. The Moody Foundation paid Mr. Bauman a total of $ 7,500 for making the trip. At petitioner's request, Mr. Bauman assisted in interviewing new bankruptcy counsel for petitioner. Mr. Bauman also traveled to Texas to ask for money for petitioner from petitioner's brother Robert, who was solvent and the dominant member of the trustees. Mr. Bauman additionally made a number of other trips between his base in Washington, D.C., and Moody offices in Texas. A check dated October 18, 1985, in the amount of $ 15,000 was drawn on the account of CIJL *231 to pay Mr. Bauman for these efforts, and to reimburse him for his expenses. Foundation of Education of Free Enterprise
In October 1985, petitioner got in touch with Caplin & Drysdale, seeking their assistance in setting up a new group of tax-exempt organizations. His proposals included an arts promotion institute, a foundation for investigative journalism, a Texas consumer foundation, and a "Texas Law Foundation". Mr. Moody also proposed the establishment of a free enterprise foundation and a Texas civil liberties legal foundation. Mr. Bauman became president and executive director of the resulting Foundation of Education of Free Enterprise (FEFE). Caplin & Drysdale drew up the necessary papers. FEFE was recognized as a tax-exempt organization pursuant to section 501(c)(3). Mr. Bauman initially relied upon the attorneys in Caplin & Drysdale for legal advice regarding FEFE. Subsequently Caplin & Drysdale declined to represent FEFE because of a possible conflict of interest arising from their representation of the Moody Foundation. On October 22, 1985, FEFE applied to the Moody Foundation for a grant, number 85-112, in the amount of $ 500,000. The stated purpose was "to *232 assist with a program to increase awareness of and promote appreciation for the free enterprise system of government through education, training, research and publications". The Moody Foundation staff reviewed the application, as did Caplin & Drysdale, which advised that the grant came within the scope of those that the Moody Foundation could make. Caplin & Drysdale also advised execution of an expenditure responsibility agreement. Petitioner was slated to be one of FEFE's directors, but he resigned when Caplin & Drysdale advised him to do so. The Moody Foundation trustees held their quarterly meeting on November 4, 1985. There they considered and approved the grant application in the amount of $ 250,000. This amount was paid on November 22, 1985. Robert Bauman paid himself a salary as president and director of FEFE. During December 1985, he received payments of $ 23,752.94 from FEFE. On December 10, 1985, Mr. Bauman sent $ 1,500 from FEFE funds to James Stoker, a longtime friend and associate of petitioner's, although Mr. Stoker did not work for FEFE. On December 17, 1985, Mr. Bauman paid petitioner's auto insurance premium of $ 2,415 out of FEFE funds. At that time, Mr. *233 Bauman was relatively uninformed concerning laws applicable to private foundations. He had no problem with Moody Foundation grants being used to aid a member of the Moody family. FEFE, under the conditions of its grant contract, conducted a poll in Texas on various issues including a State income tax. Several newspapers published articles discussing the poll results. Texas Civil Liberties Foundation
In October 1985, at petitioner's request, Caplin & Drysdale prepared the paperwork for another organization, the Texas Civil Liberties Foundation (TCL). It was recognized as a tax-exempt organization pursuant to section 501(c)(3). Its purposes included "to assist with a program to protect the civil liberties of individuals in their dealings with Federal and State regulatory bodies". Mr. Bauman was again its president and executive director. TCL applied to the Moody Foundation for a grant, number 85-109, in the amount of $ 550,000. The Moody Foundation staff and the attorneys at Caplin & Drysdale reviewed the application. Caplin & Drysdale again approved, but advised that an expenditure responsibility should be executed. Petitioner had also sought to be a director of TCL, *234 but he resigned when advised to do so by Caplin & Drysdale. The Moody Foundation trustees approved the grant in the amount of $ 250,000 in their meeting on November 4, 1985. The Moody Foundation paid this amount to TCL on November 22, 1985. Mr. Bauman paid himself $ 29,000 from TCL in 1985. In 1986, TCL sought an additional $ 300,000 from the Moody Foundation, which treated the application as part of grant number 85-109. The Foundation approved this grant in the amount of $ 225,000 and paid it to TCL on March 13, 1986. In October 1985, petitioner retained Martin Paul Solomon, an attorney in New York, to be his representative in petitioner's bankruptcy matters. TCL also engaged Mr. Solomon to complete a study of excessive costs of the bankruptcy system in Texas. Mr. Solomon was informed that Mr. Moody's case would be a prime example of such excessive costs. At petitioner's suggestion, TCL spent $ 30,000 between December 1985 and May 1986 to pay Mr. Solomon an initial retainer, plus another $ 5,000 as a retainer for David Unger, who served as local counsel in Houston, Texas. Mr. Solomon and Mr. Unger were led to believe that the money for their retainers came from wealthy *235 conservative Texans (other than petitioner or his family) who were not interested in having their names revealed. Mr. Solomon got in touch with an attorney at a law school in Ohio about working on this bankruptcy cost study. The work, however, was not completed. Mr. Bauman traveled to New York to meet with Mr. Solomon and retired Judge Roy Babbitt concerning petitioner's bankruptcy, spending some $ 1,500 to do so. Mr. Solomon later prepared and argued a motion to disqualify the currently presiding bankruptcy judge. He also filed an application in bankruptcy court for $ 360,000 in fees and expenses pertaining to his representation of petitioner. During the first half of 1986, TCL paid $ 38,015.04 to David Unger. Mr. Unger also filed an interim fee application with the bankruptcy court. Petitioner directed Mr. Bauman to engage Mr. Norman Revie, petitioner's personal assistant, to work for FEFE. Mr. Revie had been an investigator, and he became an assistant and adviser to petitioner. He handled matters with petitioner's lawyers. By all accounts, Mr. Revie was aggressive and strong-willed and dominated the relationship with petitioner. Between December 1985 and April 1986, *236 Mr. Bauman paid $ 29,885 from TCL funds to Norman Revie. At petitioner's request, early in 1986, Mr. Bauman also paid $ 2,000 from TCL funds to Lydia Kokolsky, daughter of a friend of petitioner's. Also early in 1986, Mr. Bauman made a wire transfer of $ 1,000 from TCL funds to Richard Mosier, petitioner's medical assistant, in North Carolina. Mr. Bauman maintained offices for FEFE and TCL in Washington, D.C. He also engaged former Congressman Joe Wyatt, Jr., to operate offices for those organizations in Texas. Mr. Wyatt organized the polling conducted by FEFE. Allegations of wrongdoing with respect to petitioner and the Moody Foundation began to appear in the press. In response, Mr. Bauman consulted with attorneys hired by the foundations he administered. At their direction, he stopped making payments to Martin Paul Solomon and David Unger after June 1986. During 1986, Mr. Bauman paid himself a salary of $ 59,000 from TCL and $ 50,000 from FEFE. In February 1987, Mr. Bauman took a salary of $ 10,800 for administering FEFE and $ 10,800 for administering TCL. He determined an appropriate rate by researching foundation salaries in the Washington, D.C., area. From his salary *237 payments, Mr. Bauman made loans to petitioner, totaling between $ 18,000 and $ 20,000, that Mr. Bauman anticipated petitioner would repay when he could. Dr. Herbert Smokler
Petitioner, on behalf of the Moody Foundation, retained Dr. Herbert Smokler, who had been one of petitioner's physicians, as a consulting author on the script for a television production. Between August 1985 and February 1986, the Moody Foundation paid Dr. Smokler $ 25,000 of the $ 50,000 agreed, but he produced no new written work pursuant to the understanding and only submitted previously written materials. Petitioner, however, received no benefit directly or indirectly from the payments made by the Moody Foundation to Dr. Smokler. OPINION Section 4941(a)(1) imposes upon a "disqualified person" an excise tax equal to 5 percent of the amount involved on each act of self-dealing between the disqualified person and a private foundation. This is the "first tier" tax. Subsection (b)(1) imposes a "second-tier" tax on a disqualified person equal to 200 percent of the amount involved if the act of self-dealing is not corrected within the "taxable period". [2]
*238 Pursuant to section 4941(d)(1)(C) and (E), the term "self-dealing" includes "any direct or indirect" furnishing of "goods, services, or facilities between a private foundation and a disqualified person" as well as a "transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a private foundation". A "disqualified person" is defined to include a "foundation manager", and a "foundation manager" is further defined to include a trustee of a private foundation. [3] There is no dispute that petitioner, as a trustee of the Moody Foundation, is a foundation manager, and, as such, a disqualified person with respect to the Moody Foundation. *239 Respondent's regulations make clear that "if a private foundation makes a grant or other payment which satisfies the legal obligation of a disqualified person, such grant or payment shall ordinarily constitute an act of self-dealing". Sec. 53.4941(d)-2(f)(1), Foundation Excise Tax Regs. The burden of proof in determining whether petitioner is liable for the excise taxes in issue is upon petitioner, with certain exceptions to be noted below. Petitioner argues that the burden of proof should be imposed entirely upon respondent, because the assessments were arbitrary and erroneous, citing Portillo v. Commissioner, 932 F.2d 1128 (5th Cir. 1991), affg. in part and revg. in part T.C. Memo. 1990-68. Here, however, respondent has demonstrated a sufficient nexus between petitioner and the amounts which form the basis of the proposed deficiencies. The burden thus remains upon petitioner. We are cognizant of the difficulty of proving a negative, however. As we discuss below, we have held that, in many instances petitioner's testimony, together with other evidence, has met the burden of proof thus imposed. Charges at the Hotel *240 Washington
The owner of the Hotel Washington is Gal-Tex. The Moody Foundation owns 50 percent of the stock of Gal-Tex, and the Libbie Shearn Moody Trust owns the other 50 percent. Petitioner and his guests incurred substantial unpaid charges at the Hotel Washington. When the hotel sought payment from the Moody Foundation, however, the Moody Foundation did not pay any such charges. Respondent nevertheless asserts that petitioner engaged in indirect acts of self-dealing with Moody Foundation assets when he or his guests incurred charges at the hotel. We have little trouble with respondent's premise that a disqualified person can engage in "indirect" self-dealing with private foundation's assets by engaging in transactions with an organization that is controlled by the private foundation. The question we must address, however, is whether the Moody Foundation controlled Gal-Tex. Respondent's regulations provide two specific tests to determine whether such control existed here. Section 53.4941(d)-1(b)(5), Foundation Excise Tax Regs., provides: Control. For purposes of this paragraph, an organization is controlled by a private foundation if the foundation or one or more *241 of its foundation managers (acting only in such capacity) may, only by aggregating their votes or positions of authority, require the organization to engage in a transaction which if engaged in with the private foundation would constitute self-dealing. Similarly, for purposes of this paragraph, an organization is controlled by a private foundation in the case of such a transaction between the organization and a disqualified person, if such disqualified person, together with one or more persons who are disqualified persons by reason of such person's relationship (within the meaning of section 4946(a)(1)(C) through (G)) to such disqualified person may, only by aggregating their votes or positions of authority with that of the foundation, require the organization to engage in such a transaction. * * * For purposes of this paragraph, an organization will be considered to be controlled by a private foundation or by a private foundation and disqualified persons referred to in the second sentence of this subparagraph if such persons are able, in fact, to control the organization (even if their aggregate voting power is less than 50 percent of the total voting power of the organization's *242 governing body) or if one or more of such persons has the right to exercise veto power over the actions of such organization relevant to any potential acts of self-dealing. * * *
The first test is contained in the first sentence of the material quoted above. Under that test, the Moody Foundation would control Gal-Tex if the Moody Foundation or its managers, acting only in their capacities as managers, could require Gal-Tex to provide free hotel services to petitioner and his associates. On this record, however, neither the Moody Foundation nor its managers, acting only in their capacity as managers, could force Gal-Tex to engage in such activities. The Moody Foundation controlled only 50 percent of the stock. That portion is ordinarily not enough to constitute control of Gal-Tex. See, e.g., Tex. Bus. Corp. Act Ann. arts. 2.28, 2.35 (West 1980). Under the second test, Gal-Tex would be controlled by the Moody Foundation if petitioner, together with others who are disqualified persons by virtue of their relationship to petitioner, [4] could require Gal-Tex to engage in acts of self-dealing only by aggregating their influence with that of the Moody Foundation. The evidence *243 here, however, indicates that petitioner had no such influence. To the contrary, Gal-Tex exercised considerable independence with respect to both petitioner and the Moody Foundation when it sought payment of petitioner's charges from petitioner's estate in bankruptcy and from the Moody Foundation itself. The same evidence shows that petitioner lacked actual control, or a veto power, over the activities of Gal-Tex. Thus, while Gal-Tex did not collect petitioner's hotel charges, its failure to do so was not the result of petitioner's use of influcence, alone or in concert with others. Gal-Tex instead *244 failed to collect because the Moody Foundation refused to pay charges not shown to be legally payable foundation expenses. Gal-Tex did not collect from petitioner because he was in bankruptcy. We do not regard these legal impediments to collection as a "right to exercise veto power" over the activities of Gal-Tex within the meaning of the governing regulations. Accordingly, the facts here do not fit within the second test to show that the Moody Foundation controlled Gal-Tex. The failure of an organization to come within the "control" tests of section 53.4941(d)-1(b)(5), Foundation Excise Tax Regs., may not be determinative. There may exist other ways to engage in self-dealing through organizations that are related to the private foundation. In this case, however, the Moody Foundation did not pay the charges incurred by petitioner at the Hotel Washington. The hotel was forced to write them off. Thus, if petitioner engaged in some manner of self-dealing, it was with the assets of Gal-Tex, the corporation of which petitioner was a director, not with the assets of the Moody Foundation, of which he was a trustee. Petitioner's hotel charges did not constitute self-dealing with *245 respect to the Moody Foundation. The Grants
Scope of "Amount Involved"
Section 4941(e)(2) defines the "amount involved" in an act of self-dealing as follows: The term "amount involved" means, with respect to any act of self-dealing, the greater of the amount of money and the fair market value of the other property given or the amount of money and the fair market value of the other property received; * * *. For purposes of the preceding sentence, the fair market value -- (A) in the case of taxes imposed by subsection (a), shall be determined as of the date on which the act of self-dealing occurs; and (B) in the case of the taxes imposed by subsection (b), shall be the highest fair market value during the taxable period.
The "amount involved" is determined "with respect to any act of self-dealing". Thus, under section 4941(d)(1)(E), the amount involved in the grants at issue must be determined with respect to "a transfer to, or use by or for the benefit of" petitioner. Moreover, this Court has earlier observed: "Implicit in the statutory language of subparagraph (E) of section 4941(d)(1) is the requirement that the benefits accruing to the disqualified *246 person be significant." Estate of Reis v. Commissioner, 87 T.C. 1016, 1023 (1986). Respondent, however, contends that "It does not matter what the self-dealer receives, or how much the self-dealer benefits." Instead, "the focus here is on what the foundation gives at the time of the self-dealing". Thus, respondent concludes, the "amount involved" with respect to the Moody Foundation grants in issue must be the entire amount of those grants. Respondent claims support from language of a congressional staff explanation: "the amount involved is the greater of the value of what the foundation gave or what it received at the time of the self-dealing." Staff of Joint Comm. on Taxation, General Explanation of the Tax Reform Act of 1969 at 34 (J. Comm. Print 1970). We do not accept respondent's analysis. It ignores the requirement in the statute that the amount involved must be determined "with respect to the act of self-dealing". Such an act is "a transfer to, or use by or for the benefit of" petitioner. Indeed, when considered in its proper context, the language from the congressional staff explanation quoted above shows that the act of self-dealing determines *247 the "amount involved": The first level of sanctions consists of imposing a tax on the self-dealer at a 5-percent rate on the amount involved in the self-dealing for each year (or part thereof) from the date of the self-dealing until the self-dealing is corrected (or the Internal Revenue Service mails a deficiency notice regarding the transaction, if sooner). The amount involved is the greater of the value of what the foundation gave or what it received at the time of the self-dealing. * * * [Id. at 33-34; emphasis added.]
Additionally, a number of examples in respondent's regulations demonstrate calculations of the "amount involved". All such examples indicate that the amount involved relates to property which is used by or for the benefit of a disqualified person. See sec. 53.4941(e)-1(b)(4), Examples (1) - (5), Foundation Excise Tax Regs. (We recognize that example 3 is unclear as to the "amount involved" when a disqualified person leases office space in a foundation's building for $ 3,600 for 1 year and the annual rental value of the building is $ 5,600. The example indicates that the amount involved is $ 5,600, but the example does not make clear *248 whether there are tenants of the building other than the disqualified person.) Moreover, under respondent's theory, a person who engaged in self-dealing would be liable for excise taxes imposed upon foundation awards that were spent on valid charitable purposes. Similarly, that person would be liable for excise taxes imposed upon amounts used by or on behalf of others. We do not think that such impositions are warranted. The excise taxes imposed by section 4941 were enacted in part because, under prior law, the sanctions were so great in comparison to the offense involved that the IRS and the courts were reluctant to enforce the provisions. H. Rept. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 214. The excise taxes imposed in this case are some 200 percent of the amount involved. They are intended to "provide a more rational relationship between sanctions and improper acts". S. Rept. 91-552 (1969), 1969-3 C.B. 423, 443. The purposes of the sanctions imposed by section 4941 are not served by basing them upon amounts that were spent on valid charitable or educational purposes. Nor are those purposes served by imposing upon *249 petitioner sanctions based upon amounts whose use, or misuse, was not for petitioner's benefit and was beyond petitioner's control. Respondent's theory of attributing the entire amount of the grants at issue to petitioner's self-dealing might be acceptable if the evidence demonstrated that petitioner was the mastermind behind the issuance of the grants at issue. The record, however, does not support that conclusion. When we examine control of the grant process, we find no indication that petitioner could compel the votes needed to authorize a grant in which he was interested. Petitioner's brother appeared to be the dominant member of the trustees. Petitioner testified that his aunt voted "no" on everything. There is evidence that the Moody family sought a limited guardianship with respect to Ms. Northen, but there is no indication that she was incapable of handling her responsibilities as trustee. In sum, there is no indication that petitioner could influence either his brother or his aunt to vote the way he wished. To the contrary, the facts of this case show numerous instances wherein the trustees rejected, or drastically curtailed, grants in which petitioner was interested. *250 Our impression of petitioner in this case is that he is reasonably intelligent, but naive and given to conspiracy theories. He is generous, but he trusts too readily those who are forceful or persuasive or who tell him what he likes to hear. He is garrulous, and he has difficulty in concentrating on the matter at hand. He has demonstrated no practical appreciation for the amounts of money involved in the various grants at issue, nor has he demonstrated anything approaching even an adequate business sense. We conclude that others brought about the misuse of Moody Foundation funds after the awards were made. Petitioner was not a mastermind; rather, he was manipulated by those who sought to get Moody Foundation money. In view of the foregoing, we decline to impose the sanctions of section 4941(a) based upon amounts used for acceptable purposes by the exempt organizations involved. Nor do we impose them upon amounts used by others for purposes other than petitioner's benefit. Nevertheless, we believe that petitioner is liable for some acts of self-dealing with respect to the grants in issue, and we impose the sanctions of section 4941 upon amounts directly or indirectly transferred *251 to him, or used by him or for his benefit. We discuss those transactions next. The Caddy Grants
Petitioner was impressed with Douglas Caddy and urged him to apply to the Moody Foundation for grants to carry on his work. At the trial of this case, petitioner specifically denied receiving benefits from Moody Foundation grants that went to entities with which Mr. Caddy was associated. In general, we accept those denials. Petitioner's inherited sources of income, plus proceeds from directorships and oil wells, provided him with ample income. This income stream continued, in diminished amounts, even after petitioner sought protection in bankruptcy. Thus, while Mr. Caddy apparently profited handsomely from his association with petitioner, there is little indication that petitioner benefited as well. There are, however, some exceptions. Freedom International Foundation
Mr. Caddy's Freedom International Foundation met the procedures required in order to obtain approval by the Moody Foundation. FIF sponsored a conference regarding the emerging role of Hispanics. Respondent complains that Mr. Caddy received some $ 13,743.65 in salary from the Moody Foundation's payment *252 to FIF of the third installment of $ 98,500. Petitioner has denied receiving any benefit from these grants, and we accept his denial. There is no other indication that any of this amount was used by, or on behalf of, petitioner. Investigative Research Foundation
Mr. Caddy proceeded to establish the Investigative Research Foundation in order to study the topics of terrorism and organized crime. The Moody Foundation rejected IRF's first application, but it granted three others. IRF followed the procedures necessary to obtain approval by the Moody Foundation staff and clearance by the Moody Foundation's law firm. IRF provided the Moody Foundation with audited financial statements prepared by a major accounting firm. Proceeds from the first grant, together with proceeds from the second grant, underwrote a 2-day conference on terrorism in Houston, Texas, at which U.S. and foreign officials appeared. Part of the proceeds of the third grant funded three articles dealing with organized crime. Another part sponsored a 3-day conference dealing with organized crime in Houston, Texas. Respondent complains that Mr. Caddy received more of the grant moneys than the speakers at the *253 IRF conference, and, again, Mr. Caddy seems to have been doing quite well. But there is no indication that any portion of Mr. Caddy's salary from IRF went to petitioner personally, or that such amounts were spent for his benefit. Respondent is nevertheless concerned with some specific expenditures made by IRF. Petitioner and Mr. Caddy spent some $ 10,000 trying to get the Billie Sol Estes conspiracy story. Another $ 24,000 went to Pamela Tedford, the daughter of Billie Sol Estes, in exchange for a report on drug smuggling. We suspect that petitioner's and Mr. Caddy's retention of Ms. Tedford's services as an author were, at least in part, motivated by their desire to pursue the Billie Sol Estes story. This story, however, was at least arguably connected with the white collar crime orientation of the IRF grant, and, in any event, we have no evidence that any part of these moneys went to petitioner. Petitioner indicated that he hoped to use his contacts with Mr. Estes to establish ties to the Justice Department. On this record, we believe that any such benefits petitioner sought were merely incidental to the expenditures at issue and too attenuated to constitute self-dealing *254 with Moody Foundation funds. Respondent also questions the amounts that went to Juval Aviv. Mr. Aviv testified and presented credible testimony about his activities. He prepared a number of reports for IRF. Mr. Aviv conceded that he undertook some work for petitioner that was separate from his work for IRF. On those occasions he followed petitioner's instructions, and those of Mr. Caddy, to keep track of such work separately. He was paid separately. Petitioner denied receiving any benefit from IRF funds that went to Mr. Aviv, and we have no other indication that IRF moneys that went to Mr. Aviv were used to benefit petitioner. IRF's payments to Mr. Aviv did not constitute self-dealing by petitioner. At petitioner's request, IRF also paid $ 16,000 to Marta Karpan to manage publicity and provide press assistance for a conference. Petitioner also got IRF to pay $ 4,000 to Mr. McCutcheon, although there is no indication that Mr. McCutcheon performed any work for IRF. On this record, it appears that petitioner was using his influence to steer Moody Foundation moneys to friends or associates without a quid pro quo to the Moody Foundation or to its grantees. Petitioner's actions *255 in this regard amount to use of Moody Foundation funds by a disqualified person and constitute self-dealing in the total amount of $ 20,000. Citizens Economic Foundation
Mr. Caddy was the counsel for CEF. It also was qualified as a section 501(c)(3) organization. Its grant request passed the Moody Foundation's application procedures, and its funding was approved by Caplin & Drysdale. It utilized the grant payments to produce three studies on economics, and it sponsored a conference which featured noted speakers from Congress, from the newspaper industry, and from organized labor. The Moody Foundation monitored the CEF, and maintained active communication with it. There is no indication that petitioner benefited from the grant moneys received by the CEF. Respondent again complains about the amount of money received by Mr. Caddy in comparison to that paid to the researchers on the various projects. Again, however, there is no indication that any of these moneys went to the benefit of petitioner. Texas A&M Development Foundation
Texas A&M University has a long relationship with the Moody family. The University is related to the Texas A&M Foundation, which is qualified *256 as a tax-exempt organization under section 501(c)(3). The Texas A&M Foundation assists in funding operations of the University Press. In 1980, the Texas A&M Foundation had obtained a grant whereby Jack Love was to write a book about the Texas insurance industry. When Mr. Love died, petitioner volunteered the services of Mr. Caddy, who had already written and published a successful book about politics. The Texas A&M Foundation agreed to this substitution. There were three books published as a result of this endeavor. Respondent argues, with some plausibility, that the products received did not justify payments made. This argument, however, does not establish self-dealing by petitioner. Similarly, the fact that Mr. Caddy used grant funds to purchase insurance on his life in favor of his employees did not redound to the benefit of petitioner. Nor does any benefit to petitioner appear from the process that forced Mr. Caddy to return $ 100,000 of the second grant to the Texas A&M Foundation, which then forwarded that amount to the Moody Foundation. Thus, with one exception, respondent has failed to rebut petitioner's denial that the moneys went to his benefit. The one exception *257 relates to the "Alabama Sting". At petitioner's behest, Mr. Caddy used at least $ 5,000 of Texas A&M Foundation moneys in conducting the sting operation that sought to implicate officials in Alabama in illegal activities. Petitioner was intensely interested in the success of this operation. If it worked, it would put into jail those individuals who petitioner believed were responsible for his loss of Empire Life. We think that Mr. Caddy's economic well-being depended upon retaining petitioner's good will. Accordingly, when Mr. Caddy's participation in the sting operation was sought, he was in no position to protest. Thus, when this $ 5,000 of Texas A&M Foundation grant money went into the "sting" operation, it constituted an act of indirect self-dealing. Petitioner argues that his only benefit from the sting operation would be the abstract satisfaction of seeing justice accomplished. We think that he had more in mind. Convictions of those responsible for his losing control of Empire Life would go a long way toward restoring that control. We believe, in short, that the moneys in question were used for petitioner's benefit. Petitioner additionally argues that the sting operation *258 moneys were not those of the Moody Foundation. They had passed from the Moody Foundation to the Texas A&M Foundation to Mr. Caddy, as author of the works in question. We disagree. We think that the Texas A&M Foundation funds used in the sting operation would not have been available for that use if their source had not been the Moody Foundation. The funds used in the sting operation did come from the Moody Foundation, and their use amounted to an "indirect" act of self-dealing with $ 5,000 of Moody Foundation funds. Petitioner also argues that the use of moneys of the sting operation is sanctioned by the pertinent regulations relating to the use of foundation funds by Government officials. Petitioner argues that, pursuant to section 53.4941(d)-1(b)(2), Foundation Excise Tax Regs., there would be no self-dealing if Mr. Caddy used the funds in a transaction with Government officials if certain conditions were met. Here, however, we do not believe that the funds were used in transactions with Government officials within the meaning of that regulation. Although the FBI was consulted, and although it agreed not to prosecute petitioner and Mr. Caddy for these activities, the money *259 went to finance what was essentially a self-help operation, rather than a Government operation. The $ 5,000 constitutes an act of self-dealing. Texas Institute of Government
TIG, like the organizations already mentioned, qualified as a section 501(c)(3) organization. It passed muster in the Moody Foundation's grant award procedures, and, upon its execution of an expenditure responsibility agreement, Caplin & Drysdale did not object to Moody Foundation's funding the grant. TIG received $ 100,000 and paid $ 48,000 of that amount to an organization owned by Douglas Caddy for a report. Again, while this transaction raises questions about the effective use of the money awarded, it reveals no benefit, directly or indirectly, to petitioner. University of Houston Law Foundation
The Law Foundation sought a grant to produce a seminar on white collar crime. It followed the procedures of the Moody Foundation, undergoing a staff review. The resulting symposium took place in October 1984. Much of the money went to the first director of the project, a California attorney named David Brockway. Mr. Brockway was later replaced. Mr. Brockway's efforts nevertheless contributed substantially *260 to the subsequent success of the symposium. Respondent attacks Mr. Brockway's payment of $ 90,000 in Foundation funds to one "Newman", an alleged underworld figure. Respondent asserts that these payments were made in an attempt to utilize Mr. Brockway's contacts with figures in the Department of Justice on petitioner's behalf. Petitioner, however, testified that he received no such benefits. Absent other evidence, we believe that any such results, even if intended, were too attenuated to be termed "self-dealing". The Pabst Grants
Mr. Pabst's career was "foundationing"; he and his associates, including Vance Beaudreau, made a career of talking wealthy individuals into forming their own tax-exempt foundations. Once this was done, Mr. Pabst would take over directing the grant application and expenditure activities of these foundations. During the course of his association with petitioner, he was convicted of improper influence with respect to another foundation. Petitioner was a naive and self-absorbed trustee of the wealthy Moody Foundation. He presented a golden opportunity for Mr. Pabst. We believe that petitioner was duped by Mr. Pabst's ardent alliance with petitioner *261 and his interests. Based upon the record in this case, we think that Mr. Pabst engaged in a systematic effort to use three grantee foundations, the Carlson Foundation, the Earl Foundation, and HLI, to milk Moody Foundation funds for himself and his associates. Mr. Pabst and his associates diverted up to 90 percent of the amounts awarded to these foundations. We do not think that these amounts, for the most part, represent self-dealing by petitioner. Petitioner has denied receiving any benefit from CIJL or from the foundations that Mr. Pabst established as receptacles for Moody Foundation funds. Some amounts, however, do constitute self-dealing on behalf of petitioner, even if the self-dealing was conducted indirectly with moneys that had passed into foundations created by Mr. Pabst or his associates. By the time Mr. Pabst appeared, petitioner began having difficulties in receiving income. Between 1983 and 1985, the bankruptcy proceedings diminished petitioner's income stream. By mid-1985, the bankruptcy proceedings resulted in an interruption to proceeds from Trusts 19 and 57. Although he had possible recourse to family assets, he had developed a severe cash-flow problem. *262 Late in 1984, Moody Foundation moneys came into the Carlson Foundation. At that time, Mr. Pabst directed an employee to travel to North Carolina and to Alabama for the purpose of digging up information that might be used to discredit judges who were working, or had worked, on petitioner's court cases. The employee spent $ 8,000 on these endeavors. Mr. Pabst also directed the same employee to deliver $ 2,000 to petitioner. This $ 10,000, whether spent wisely or foolishly, constituted the amounts involved in acts of self-dealing on behalf of petitioner. CIJL's attorney Butch Bradt submitted bills totaling $ 95,385 for work on behalf of petitioner's various legal interests, including his bankruptcy. Mr. Bradt billed at a rate of $ 200 to $ 300 per hour. Based upon our review of the record, we have reason to doubt that petitioner got his money's worth. The operative fact here, however, is that Moody Foundation moneys were steered through Mr. Pabst's entities to pay for efforts undertaken on petitioner's behalf. The payment of $ 95,385 to Mr. Bradt pursuant to his billings for petitioner's cases constitutes indirect self-dealing within the scope of section 4941(a)(1) on behalf *263 of petitioner. Moody Foundation moneys were also funneled through the Pabst entities to pay a total of $ 92,818 to Jane Ford. Her work and quality of representation appear to be at least adequate, but she worked for petitioner and not for a tax-exempt organization. Petitioner cites some billings for "reports" she did after ceasing active representation of him. These reports, however, deal with topics closely related to petitioner's problems with losing his insurance company. We believe these reports merely constitute a cover for Ms. Ford's receipt of payments for legal work on behalf of petitioner personally. The $ 92,818 benefited petitioner personally and constituted self-dealing with Moody Foundation assets. Finally, CIJL paid $ 15,000 to Mr. Bauman for work he performed before establishing the foundations with which he was associated. These amounts included payment for interviewing petitioner's bankruptcy attorneys and attempting to borrow money for petitioner from his brother. These amounts also represent self-dealing with Moody Foundation assets pursuant to section 4941(a)(1). We believe, however, that the $ 7,500 paid to Mr. Bauman for traveling to Mountain Lake, *264 Virginia, to interview Ms. Northen is properly a Moody Foundation expense. It is not self-dealing on the part of petitioner. The Bauman Grants
In 1985, at petitioner's behest, Caplin & Drysdale incorporated six foundations dealing with the arts, investigative journalism, consumer advocacy, and civil liberties issues. Robert Bauman, who had met petitioner earlier and agreed to meet with petitioner's aunt, became the head of both FEFE and TCL. Petitioner sought to be a director of these institutions, but when Caplin & Drysdale suggested that such service might be a conflict of interest, he resigned. FEFE and TCL both obtained Moody Foundation grants. Before the grants were awarded, FEFE and TCL followed Moody Foundation grant procedures. FEFE conducted polls about political issues in Texas. The results were published and provided to State officials. FEFE and TCL issued some amounts of money to Mr. Bauman. These appear to be amounts associated with Mr. Bauman's salary, however, and they do not constitute self-dealing by petitioner. Although Mr. Bauman later advanced some $ 18,000 to $ 20,000 to petitioner, Mr. Bauman considered these amounts to be loans. On this record, *265 Mr. Bauman's advances to petitioner did not constitute self-dealing income for the benefit of petitioner. Pursuant to petitioner's instructions, Mr. Bauman also paid amounts that totaled $ 29,885 from TLC funds to Norman Revie, petitioner's assistant. Petitioner claims that he did not benefit from this payment, but we disagree. Mr. Bauman testified that Mr. Revie did no work for TCL. Payment of these amounts to Mr. Revie constitute petitioner's personal use of Moody Foundation funds; they are thus self-dealing income to petitioner. At petitioner's suggestion, TCL also paid $ 30,000 to petitioner's bankruptcy attorney Martin Paul Solomon. Although some of this money was to be spent on putative research projects, no such research project was forthcoming. TCL funds were also used to pay $ 43,011.04 to David Unger, a Texas attorney who represented petitioner in his bankruptcy proceedings. Mr. Solomon and Mr. Unger were led to believe that the actual source of the funds was a group of conservative Texans who were anxious to assist petitioner. These amounts, however, paid to petitioner's bankruptcy counsel, came from the Moody Foundation and merely passed through TCL. On the basis *266 of the evidence presented, we believe that these amounts were instrumental in retaining Mr. Solomon and Mr. Unger as petitioner's representatives during 1985 and 1986. These payments benefited petitioner and constitute amounts involved in self-dealing. The same is true of Mr. Bauman's $ 1,500 expense reimbursement for attending a meeting in New York with Mr. Solomon and Judge Babbitt. FEFE paid $ 2,415 of petitioner's automobile insurance. Although petitioner claimed that this payment was necessary so that petitioner could visit his aunt and fellow trustee, we find that excuse unavailing. The payment of petitioner's auto insurance was payment of a personal expense and constituted self-dealing by petitioner. Similarly, TCL's payments of $ 2,000 to Lydia Kokolsky and $ 1,000 to petitioner's therapist Richard Mosier constitute petitioner's use of Moody Foundation moneys within the meaning of section 4941(a)(1). Dr. Herbert Smokler
Dr. Herbert Smokler, who had been one of petitioner's physicians, undertook an agreement with the Moody Foundation to prepare a script. Although he received half of the agreed amount, Dr. Smokler did not complete the assignment. The reasons *267 for his failure to do so do not appear in the record. The record contains samples of other creative writings of Dr. Smokler. Although we do not pass upon their artistic merit, we agree with petitioner that he did not derive any benefit from the grants to Dr. Smokler. The amounts paid to Dr. Smokler were not the result of self-dealing by petitioner within the meaning of section 4941(a). Section 4941(b)(1)
As noted above, the "second tier" taxes on self-dealing are imposed by section 4941(b)(1) if the disqualified person fails to cure or correct the act of self-dealing within the taxable period. With respect to the acts that we have found constitute self-dealing, there is no evidence that petitioner corrected any such acts before the expiration of the taxable period; here, the date of mailing the notice of deficiency. Accordingly, petitioner is liable as a self-dealer for the second-tier taxes imposed by section 4941(b)(1) with respect to those acts for which we have held him to be liable under section 4941(a)(1). Concerning the imposition of sanctions under section 4941(a)(1) and (b)(1), respondent presented the testimony of two witnesses, David Wooten and Gary Nichols. *268 Petitioner has sought to strike that testimony as irrelevant. Those motions are denied. While we have found their testimony relevant and admissible, we have given it little weight. Excise Tax on Foundation Managers
Section 4941(a)(2) [5] imposes an excise tax upon a foundation manager who participates in an act of self-dealing between a disqualified person and a private foundation. There are three conditions to imposition of the excise tax under section 4941(a)(2): First, there must be an excise tax imposed under section 4941(a)(1); second, the foundation manager involved must know that the act in issue is an act of self-dealing; and, third, his participation in the act of self-dealing must be willful and not due to reasonable cause. *269 For purposes of this section, a person participates in a transaction "knowing" that it is an act of self-dealing only if that person has actual knowledge of sufficient facts so that, based solely upon such facts, such transaction would be an act of self-dealing. Additionally, that person must be aware that under these facts, the transaction may be an act of self-dealing. Moreover, the person must in fact be aware that the act constitutes self-dealing, or that person must negligently fail to ascertain whether the transaction is, in fact, an act of self-dealing. Sec. 53.4941(a)-1(b)(3), Foundation Excise Tax Regs. Finally, participation "is not willful if he does not know that the transaction in which he is participating is an act of self-dealing." Sec. 53.4941(a)-1(b)(4), Foundation Excise Tax Regs. Respondent has the burden of proving that a foundation manager's participation in an act of self-dealing is a result of knowing conduct. Such burden of proof is to be carried by clear and convincing evidence. Sec. 7454(b); Rule 142(c). Initially, we observe that, as described above, there are excise taxes imposed under section 4941(a)(1) for self-dealing with respect to hundreds *270 of thousands of dollars from the grants at issue. That is, Moody Foundation moneys were expended indirectly, through other organizations, for petitioner's use or benefit. Nevertheless, except for the amounts described below, respondent has failed to convince us that petitioner's participation in these acts of self-dealing is the result of knowing conduct within the meaning of section 4941(a)(2) and its accompanying regulations. We are not convinced that petitioner had actual knowledge of the facts regarding most of the moneys that were being used on his behalf. With respect to these amounts, petitioner was under the influence of William Pabst and his organization. Petitioner is naive and lackadaisical, and he did not know of many of Mr. Pabst's machinations. For example, we doubt that petitioner knew of the substantial amounts being paid by Mr. Pabst to attorney Butch Bradt or to his employees and entities. Most importantly, however, respondent has not provided us with clear and convincing evidence that petitioner was aware that expenditures made on his behalf might violate the provisions against self-dealing. With respect to the grants in issue, petitioner had arranged for *271 the Moody Foundation to hire the firm of Caplin & Drysdale. That firm exercised an active participation in reviewing the grants in which petitioner had an interest, and petitioner generally followed its advice. Thus, when Caplin & Drysdale advised petitioner to resign as director of the FEFE and TCL foundations, he did so. When Caplin & Drysdale advised petitioner of the difficulties with his history of unpaid charges at the Hotel Washington, petitioner moved out. For the most part, petitioner did not interfere with Caplin & Drysdale's review. Petitioner's actions reveal an intention to avoid self-dealing, rather than the opposite. Petitioner did not act alone in the approval process. The vote of at least two trustees was needed to secure the award of a grant, and there is no suggestion that the other trustees were motivated by any knowledge or desire of benefiting petitioner. The fact that petitioner could not divert Moody Foundation assets by himself further indicates a lack of awareness as to the legal ramifications of possible "self-dealing" with those assets. Similarly, the grant files introduced into evidence show an active and continuous review process by the Moody *272 Foundation's staff, independently of petitioner's involvement. To be sure, the record strongly suggests that on occasion petitioner sought to influence the rate at which grants to the Pabst/CIJL foundations were approved and awarded. But the rapidity of consideration and payment are not themselves acts of self-dealing, nor are they unique to the grants at issue. We believe that petitioner's actions in this respect are the result of prodding by Mr. Pabst and not the result of guilty knowledge by petitioner. Additionally, although we have found that substantial sums were used indirectly for petitioner's benefit, ownership of those funds had passed from the Moody Foundation to the grantee organizations. Respondent has not shown that petitioner was aware that funds of those organizations might constitute assets of the Moody Foundation for purposes of the self-dealing statutes. We have also observed petitioner's demeanor and his testimony carefully. On the basis of those observations, we conclude that petitioner believed that the legitimate goals of the charitable foundations were served by the grants. Most of the amounts at issue supported acceptable causes. The grants produced *273 numerous books, articles, reports, and seminars that were consistent with the purposes for which the grants were issued. Payments to his lawyers for "studies" of the judicial system were also proper, to petitioner's perception, despite the fact that these studies might be supportive of his legal claims. Similarly, we believe that petitioner thought that he was promoting the public good with his promotion of the Alabama sting operation. Petitioner has testified credibly that he viewed the Moody Foundation as a public trust. With a few exceptions, we are not convinced he knowingly abused that trust. We readily understand respondent's suspicions as to petitioner's knowing participation in the acts of self-dealing involved here. But the applicable law places a heavy burden upon respondent as to these suspicions, one which, on this record, respondent has not met. There remain instances wherein we must say that respondent has shown, with clear and convincing evidence, that petitioner acted knowingly, willfully, and without reasonable cause in acts of self-dealing. These acts are those in which petitioner himself directed the use of Moody Foundation assets in the hands of grantee *274 foundations for his own personal purposes. Such acts include petitioner's direction that IRF pay Marta Karpan amounts that totaled $ 16,000 for apparently negligible work on behalf of that foundation, and petitioner's direction that IRF pay an additional $ 4,000 to Wilmot McCutcheon, despite the fact that Mr. McCutcheon did no work for IRF. Petitioner's knowing and willful acts of self-dealing also extend to Mr. Bauman's use of FEFE funds to pay $ 1,500 to James Stoker and $ 2,415 to petitioner's automobile insurance company. Similarly knowing and willful were petitioner's directions to Mr. Bauman that he put Mr. Revie on the payroll, at a cost of $ 29,885, despite the fact that Mr. Revie did no work for the foundation. We reach the same conclusion regarding Mr. Bauman's payments of $ 2,000 to Ms. Kokolsky and $ 1,000 to Mr. Mosier. Section 6684
Section 6684(2) imposes a penalty upon a person who becomes liable for a tax under section 4941 for actions that are willful and flagrant, and not due to reasonable cause. The penalty is equal to the amount of the tax imposed under section 4941. Respondent bears the buren of proof under section 6684(2). Accordingly, respondent *275 must establish that petitioner's actions with respect to the taxable expenditures were both willful and flagrant. Larchmont Found., Inc. v. Commissioner, 72 T.C. 131, 139 (1979), vacated and remanded without published opinion on another issue 659 F.2d 1085 (7th Cir. 1981). The term "willful and flagrant" takes its meaning from section 507(a)(2)(A) and its accompanying regulations. Sec. 301.6684-1(c), Proced. & Admin. Regs. Section 1.507-1(c)(2), Income Tax Regs., provides: (2) For purposes of section 507(a)(2)(A), a "willful and flagrant act (or failure to act)" is one which is voluntarily, consciously, and knowingly committed in violation of any provisions of chapter 42 (other than section 4940 or 4948(a)) and which appears to a reasonable man to be a gross violation of any such provision.
We find that those instances for which additions to tax under section 6684 should be imposed are the same as those subject to the foundation manager excise taxes under section 4942(a)(2). Thus, the payments of $ 16,000 to Ms. Karpan, $ 4,000 to Mr. McCutcheon, $ 1,500 to Mr. Stoker, $ 2,000 to Ms. Kokolsky, $ 1,000 to Mr. Mosier, *276 $ 29,385 to Mr. Revie, and $ 2,415 to petitioner's insurance company are subject to the additions under section 6684. Each such intentional act of self-dealing exceeds $ 1,000 and would appear to a reasonable man to be a gross violation of the self-dealing provisions. Petitioner is liable for the additions to tax based upon the amounts so paid. To give effect to the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. At trial, respondent conceded amounts determined as deficiencies under secs. 4941(b)(2) and 4945(a) and (b).↩
2. The statute provides in part as follows: SEC. 4941. TAXES ON SELF-DEALING. (a) Initial Taxes. -- (1) On Self-Dealer. -- There is hereby imposed a tax on each act of self-dealing between a disqualified person and a private foundation. The rate of tax shall be equal to 5 percent of the amount involved with respect to the act of self-dealing for each year (or part thereof) in the taxable period. The tax imposed by this paragraph shall be paid by any disqualified person (other than a foundation manager acting only as such) who participates in the act of self-dealing. * * * * * * (b) Additional Taxes. -- (1) On self-dealer. -- In any case in which an initial tax is imposed by subsection (a)(1) on an act of self-dealing by a disqualified person with a private foundation and the act is not corrected within the taxable period, there is hereby imposed a tax equal to 200 percent of the amount involved. The tax imposed by this paragraph shall be paid by any disqualified person (other than a foundation manager acting only as such) who participated in the act of self-dealing. * * * (e) Other Definitions. -- For purposes of this section -- (1) Taxable period. -- The term "taxable period" means, with respect to any act of self-dealing, the period beginning with the date on which the act of self-dealing occurs and ending on the earliest of -- (A) the date of mailing a notice of deficiency with respect to the tax imposed by subsection (a)(1) under section 6212, (B) the date on which the tax imposed by subsection (a)(1) is assessed, or (C) the date on which correction of the act of self-dealing is completed.↩
3. SEC. 4946. DEFINITIONS AND SPECIAL RULES. (a) Disqualified Person. -- (1) In General. -- For purposes of this subchapter, the term "disqualified person" means, with respect to a private foundation, a person who is -- * * * (B) a foundation manager (within the meaning of subsection (b)(1),
* * * (b) Foundation Manager. -- For purposes of this subchapter, the term "foundation manager" means, with respect to any private foundation -- (1) an officer, director, or trustee of a foundation (or an individual having powers or responsibilities similar to those of officers, directors, or trustees of the foundation), and (2) with respect to any act (or failure to act), the employees of the foundation having authority or responsibility with respect to such act (or failure to act).↩
4. We note that, on this record, no others are "disqualified persons" because of their relationship to petitioner. We recognize that petitioner possessed two-fifths of a one-eighth income interest in the Libbie Moody Trust. This falls far short of the 35 percent beneficial interest in the entire trust required to make that trust a "disqualified person" by virtue of its relationship to petitioner under sec. 4946(a)(1)(G).↩
5. The statute provides in part as follows: SEC. 4941. TAXES ON SELF-DEALING. (a) Initial Taxes. -- * * * (2) On Foundation Manager. -- In any case in which a tax is imposed by paragraph (1), there is hereby imposed on the participation of any foundation manager in an act of self-dealing between a disqualified person and a private foundation, knowing that it is such an act, a tax equal to 2 1/2 percent of the amount involved with respect to the act of self-dealing for each year (or part thereof) in the taxable period, unless such participation is not willful and is due to reasonable cause. The tax imposed by this paragraph shall be paid by any foundation manager who participated in the act of self-dealing.↩